## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **DENISE GAITANTZIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.** |
| | ) | |
| **v.** | ) | **Judge** |
| | ) | **Magistrate Judge** |
| **METROPOLITAN NASHVILLE** | ) | |
| **AIRPORT AUTHORITY and NEALE** | ) | **Jury Demand** |
| **BEDROCK, in his Official Capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

For her Complaint against Defendants Metropolitan Nashville Airport Authority ("MNAA") and Neale Bedrock, in his official capacity ("Mr. Bedrock") (collectively "Defendants"), Plaintiff Denise Gaitantzis ("Ms. Gaitantzis") states:

### PARTIES

1.     Ms. Gaitantzis is a former employee of MNAA.

2.     MNAA is a public corporation organized and existing under the laws of the State of Tennessee with its principal place of business at 140 BNA Park Drive, Suite 520, Nashville, Tennessee 37214-4103.   MNAA may be served with process through its registered agent, Theodore G. Morrissey, 140 BNA Park Drive, Suite 520, Nashville, Tennessee 37214-4103.

3.     Mr. Bedrock is a citizen and resident of Tennessee, MNAA's General Counsel and Chief Compliance Officer, and a former supervisor of Ms. Gaitantzis.  Mr. Bedrock may be served with process in his official capacity through MNAA's registered agent, Theodore G. Morrissey, 140 BNA Park Drive, Suite 520, Nashville, Tennessee 37214-4103.

## JURISDICTION AND VENUE

4.      This is an action for equitable relief and damages for violation of constitutional rights secured by the First and Fourteenth Amendments to the United States Constitution as well as for unlawful employment practices.  This action is brought under 42 U.S.C. § 1983 ("§ 1983"); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq*. ("ADEA"); and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq*. ("THRA").  The Court has jurisdiction under 28 U.S.C. §§ 1331, 1332, 1343(a)(4), and 1367(a).  Venue is proper under 28 U.S.C. § 1391.

5.      Ms. Gaitantzis has met all conditions precedent to the filing of this Complaint. She timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on August 1, 2023.  The EEOC through the U.S. Department of Justice issued her Notices of Right to Sue on October 13, 2023.

## FACTS

6.      Ms. Gaitantzis is a 62-year-old female who worked for MNAA as Director, Compensation, Benefits, and HR Systems, from October 21, 2021, until Defendants terminated her employment on May 1, 2023.

7.      Ms. Gaitantzis was qualified for her job with MNAA and performed her duties in a competent and satisfactory manner.  She received satisfactory or better performance evaluations, bonuses, and a $10,500 pay increase in July 2022.  She never received any performance improvement plans from Defendants.

8.      In late October 2022, Ms. Gaitantzis' then-immediate supervisor, Vice President of Administration Gale LaRoche, advised her that she would be "retiring" at the end of the year.

Ms. Gaitantzis advised Ms. LaRoche that she would like to be considered for an Assistant Vice President ("AVP") of Human Resources ("HR") position that would become available, as she had been an HR Director for about 20 years and had the skills, knowledge, and experience necessary to perform the job.

9. Ms. LaRoche advised Ms. Gaitantzis that she would inform MNAA's General Counsel and Chief Compliance Officer, Mr. Bedrock, of Ms. Gaitantzis' interest in an AVP of HR position.

10. Ms. Gaitantzis followed up with Ms. LaRoche about the AVP of HR position a couple of weeks later. Ms. LaRoche advised Ms. Gaitantzis that Mr. Bedrock had indicated that he was going to hire a younger male, Robert Carpenter, for the position.

11. Mr. Carpenter declined MNAA's offer of the AVP of HR position. MNAA through Mr. Bedrock later hired Randy Dorsten, a significantly younger male, for the position without interviewing or considering Ms. Gaitantzis, despite knowing of her expressed interest in and qualifications for the position.

12. Defendants failed and refused to promote Ms. Gaitantzis to the AVP of HR position because of her sex and/or age. Ms. Gaitantzis was significantly better qualified for the position than the younger male employees Defendants offered the position to and hired for it.

13. In mid-November 2022, Ms. Gaitantzis was involved in interviewing candidates for an HR Administrative Assistant position with MNAA.

14. On or about November 21, 2022, Ms. LaRoche, who was leaving MNAA on December 30, 2022, advised Ms. Gaitantzis that she would allow her to select the appropriate candidate for the HR Administrative Assistant position.

15.     Ms. Gaitantzis and Ms. LaRoche agreed to offer the position to Ayauna B., a female and the most qualified candidate for the HR Administrative Assistant position.

16.     MNAA's Talent Acquisition Specialist, JeWuana Jobe, offered the HR Administrative Assistant position to Ayauna B.

17.     On or about December 6, 2022, Ayauna B. declined MNAA's offer for the HR Administrative Assistant position.

18.     Ms. Gaitantzis then requested that MNAA offer the HR Administrative Assistant position to Sharon T., a female, because she had strong HR, Administrative Assistant, and Accounts Payable skills and was able to provide the best support to HR.

19.     Ms. Gaitantzis further advised Ms. LaRoche that the male candidate, Henry Vongphakdy, did not have the requisite Administrative skills or experience, that his experience had been in Accounting and Finance, and that he had held several jobs over the last several years.

20.     Ms. LaRoche advised Ms. Gaitantzis that Mr. Bedrock had selected the male candidate, Mr. Vongphakdy, for the HR Administrative Assistant position specifically because Mr. Bedrock had stated that "the HR Team needs a male."

21.     Mr. Bedrock had not reviewed the resumes of the candidates for the HR Administrative Assistant position nor had he interviewed any of them.

22.     Mr. Vongphakdy was significantly less qualified for the HR Administrative Assistant position than the two female candidates.

23.     In December 2022, Ms. Gaitantzis repeatedly engaged in constitutionally protected activity by speaking or engaging in speech activity on a matter of public concern by

speaking out about, opposing, and reporting what she reasonably believed to be sex discrimination in hiring in Defendant's HR Department.

24.    Based upon Ms. LaRoche's statements to her about Mr. Bedrock being responsible for directing that Mr. Vongphakdy be hired for the HR Administrative Assistant position and the stated reason for that hire, Ms. Gaitantzis asked Ms. LaRoche for a meeting with Mr. Bedrock to discuss the candidates for the position and why she believed that it was inappropriate and unlawful to select a less qualified male for the position over more qualified female candidates.

25.    Ms. LaRoche warned Ms. Gaitantzis that "there [would] be consequences" if she met with Mr. Bedrock.  Ms. Gaitantzis asked Ms. LaRoche what she meant.  Ms. LaRoche stated that whenever an employee had asked to meet with Mr. Bedrock, it never went well, but that Ms. Gaitantzis could go ahead and schedule a meeting with him if she wished to do so.

26.    Later on December 6, 2022, Ms. Gaitantzis scheduled a meeting with Mr. Bedrock through his paralegal / assistant, Melissa Ting.  Ms. Ting scheduled the meeting on Ms. Gaitantzis' and Mr. Bedrock's calendars for December 8, 2022.  About 45 minutes later, Ms. Ting asked Ms. Gaitantzis what she wanted to meet with Mr. Bedrock about.  Ms. Gaitantzis responded, "Hiring the HR Administrative Assistant and the candidates for the position."

27.    In addition to speaking with Ms. LaRoche about her concerns, Ms. Gaitantzis spoke with Ms. Jobe about Mr. Bedrock's directing that the less qualified male be hired for the HR Administrative Assistant position.  Ms. Jobe asked her if Mr. Bedrock had seen the candidates' resumes and stated that the male candidate was "the least qualified."  Ms. Jobe further questioned how Mr. Bedrock could make or direct the hiring decision when he had not been involved in the candidate interviews.  Ms. Gaitantzis advised Ms. Jobe that she had

requested a meeting with Mr. Bedrock to show him the candidate resumes and discuss the matter with him.

28.　On December 7, 2022, Ms. Gaitantzis noticed on her calendar that her December 8, 2022, meeting with Mr. Bedrock had been cancelled without any feedback. She asked Ms. LaRoche if she knew why it had been cancelled. Ms. LaRoche stated that Mr. Bedrock had cancelled the meeting.

29.　Ms. Gaitantzis reminded Ms. LaRoche that Ms. Jobe was questioning why Mr. Bedrock had directed that the less qualified male candidate be hired for the HR Administrative Assistant position over more qualified females.

30.　The HR Team consisting of Ms. Gaitantzis, Ms. Jobe, HR Manager Amanda Potts, and HR Manager Chandra Starks further discussed how the selection of Mr. Vongphakdy over more qualified female candidates constituted sex discrimination.

31.　Nevertheless, Defendants hired Mr. Vongphakdy for the HR Administrative Assistant position.

32.　On or about December 8, 2022, Ms. Gaitantzis spoke to HR Manager Starks about Mr. Bedrock's directing that a less qualified male be hired for the stated reason that there were no males in the HR department.

33.　Ms. Starks stated to Ms. Gaitantzis, "That is sex discrimination, which is illegal."

34.　Ms. Gaitantzis advised Ms. Starks that she agreed with her and that she had advised Ms. LaRoche of her concerns of sex discrimination in hiring, as well.

35.　On December 29, 2022, Ms. LaRoche presented Ms. Gaitantzis with her mid-year performance review. In the "Supervisor Comments and Recommendations" section, Ms. LaRoche wrote that "Denise [Gaitantzis] has done a great job in improving our benefits

6

processing by implementing a new benefits software system that is much more efficient than what was in place previously. She has also done a great job in auditing the records and finding items that need to be corrected." Ms. LaRoche also wrote, "The fact that you, against my advice, went to discuss this issue [of hiring a male HR Assistant] with Neale [Bedrock] is also problematic. Neale [Bedrock] has shared that he feels that displays a lack of respect for my role and this behavior cannot continue with the new AVP HR."

36.     Ms. Gaitantzis was surprised to see the latter comments in her performance review and asked Ms. LaRoche why she had never mentioned any such concerns to her during the weeks that had passed since she attempted to schedule a meeting with Mr. Bedrock to discuss her concerns of sex discrimination. Ms. Gaitantzis was unaware of any such concerns until she received her performance review.

37.     Ms. LaRoche specifically advised Ms. Gaitantzis that Mr. Bedrock had directed her to include the negative comments in Ms. Gaitantzis' performance review.

38.     Ms. Gaitantzis also exchanged emails with Ms. LaRoche on December 29, 2022, and further opposed the retaliatory comments that Mr. Bedrock had directed Ms. LaRoche to include in her performance review.

39.     At 5:10 p.m. on December 29, 2022, Ms. LaRoche sent Ms. Gaitantzis an email stating, "I am sorry that I did not have a chance to get back with you this afternoon, I am busy trying to wrap up things so I can leave [MNAA] tomorrow. I am not sure what you mean when you say that you have documentation of what transpired with the hiring of the HR Assistant. At no time did I ever tell you that Neale [Bedrock] decided who would be hired [for the HR Administrative Assistant position]; I briefed him about the candidate and the process and he said that he really liked the fact that we would have the diversity in the HR department that [male

candidate] Henry [Vongphakdy] would bring.  He was not involved in the hiring process, so he could not make the decision to hire, that is up to the panel to decide.  I will try to meet with you tomorrow, but I am leaving at noon."

40.     Ms. Gaitantzis responded to Ms. LaRoche's above email and indicated that if Ms. LaRoche had not told her that Mr. Bedrock had directed that the male candidate be hired for the HR Administrative Assistant position she would never have asked to meet with Mr. Bedrock about the matter.  The reason Ms. Gaitantzis had requested a meeting with Mr. Bedrock was because Ms. LaRoche had advised her that Mr. Bedrock had directed that the male candidate be hired over more qualified female candidates because the HR Team needed a male.

41.     At 12:16 p.m. on December 30, 2022, Ms. LaRoche sent Ms. Gaitantzis a final email stating, "I spoke with Neale [Bedrock] about your review (as he has reviewed it before it was delivered to you).  It will stand as written.  You, as always, are able to write any comments you may have in the box below.  Please do so, sign it, and then send the completed copy to Neale [Bedrock] and to the performance management mailbox to go into your personnel file."

42.     On or about January 2, 2023, Ms. Gaitantzis provided a concise reply and rebuttal in the "Employee Comments" section of her performance review.  She again opposed and objected to the retaliatory comments that Mr. Bedrock had directed Ms. LaRoche to put in the review.  She also attached a list of her performance and accomplishments during the review period and an email from Ms. LaRoche thanking her for the list and stating that it would be attached to her review, because the list had not been attached to the review.

43.     On December 30, 2022, Ms. LaRoche left MNAA and promptly went to work for another company in Michigan the next week, in January 2023.

44.     In early January 2023, Mr. Bedrock and Senior Attorney and then-Acting Assistant Vice President of Human Resources, Ijeoma Ike, began subjecting Ms. Gaitantzis to severe and pervasive retaliatory harassment, verbal attacks and abuse, and other retaliatory conduct because she had opposed, reported, and refused to remain silent about what she reasonably believed to be sex discrimination in hiring in MNAA's HR Department.  Ms. Gaitantzis had never observed Mr. Bedrock treating male and younger employees the way he began treating her.  Further, Mr. Bedrock had never treated Ms. Gaitantzis in this manner before she opposed, reported, and refused to remain silent about sex discrimination.

45.     For example, on January 12, 2023, Mr. Bedrock began a meeting by yelling and screaming at Ms. Gaitantzis in a hostile and abusive manner.  Referring to an employee Health Savings Account ("HSA") transfer process by which employee HSA funds would be transferred from WEX Health to HealthEquity, which Ms. Gaitantzis had emailed him during the first week of January 2023, Mr. Bedrock exclaimed, "This is a cluster, cluster, cluster!  A complete cluster!"  He then stated that "this is not how we take care of our employees."

46.     Ms. Gaitantzis explained to Mr. Bedrock that she had not made the decision to implement "Individual" HSA transfers and that, in October 2022, MNAA's brokers, WEX Health and Mercer, directed that the transfers be done as Individual Transfers.  She reminded him that WEX had directed that it could not do a "Bulk Transfer" for only 110 employees; rather, WEX required 250 or more employees to do a Bulk Transfer.  She further explained that her supervisor, Ms. LaRoche, had approved the decision to do Individual Transfers in October 2022 and that she was simply following directives.

47.     Ms. Gaitantzis also reminded Mr. Bedrock that her focus from July through the end of October 2022 had been the successful implementation of a new Benefits platform to

integrate with MNAA's HRIS and that she had worked nights and weekends to ensure that this process went perfectly according to plan prior to the Benefits Enrollment Period.

48.     Mr. Bedrock exclaimed to Ms. Gaitantzis, "You will get on the phone with WEX today, and you will keep going up the chain to their top attorney, and you will demand that they do a Bulk Transfer."

49.     In an effort to comply with Mr. Bedrock's directives, on January 12, 2023, Ms. Gaitantzis spoke to Mercer representative Jana Bollinger and advised her that the transfer must be a Bulk Transfer.  Ms. Gaitantzis and Ms. Bollinger then worked together to explain to WEX why Mr. Bedrock was demanding a Bulk Transfer.  The WEX Senior Analyst to whom they spoke stated that she would communicate with WEX's Compliance Team and advise if it would approve the requested Bulk Transfer.

50.     On January 13, 2023, Mr. Bedrock yelled and screamed at Ms. Gaitantzis again during a teleconference in the presence of her HR co-worker, Toiya Walker, and Senior Attorney Ijeoma Ike.  He asked Ms. Gaitantzis if she had secured the Bulk Transfer.  Ms. Gaitantzis responded that WEX had not yet confirmed that it would do a Bulk Transfer because its Compliance Team had not yet approved it but that she had made the request for a Bulk Transfer. Mr. Bedrock then yelled, "You and your Benefits Team have screwed this up!  And I shared this with [MNAA CEO] Doug [Kreulen] today!"

51.     On Saturday, January 14, 2023, Ms. Gaitantzis received an email from Mr. Bedrock directing her to complete an "HSA Transfer Event, After-Action Report / Improvement Plan" template, which would become public information within MNAA on its internal intranet. Mr. Bedrock further attempted to have Ms. Gaitantzis state that it was her mistake to use the Individual Transfer process, even though WEX had insisted that the transfers be done as

Individual Transfers, Mercer had stated that Individual Transfers was the proper and safest way to process the transfers, and Individual Transfers had previously been approved and directed by her supervisor, Ms. LaRoche.

52.    Ms. Gaitantzis declined to state that she had made the decision for the Individual Transfer process because she had not done so.  Instead she listed the facts as to how the transfer decision had actually been made, and made suggestions for better communication processes to avoid any future issues.  She then submitted the report to Mr. Bedrock and Ms. Ike as requested on January 27, 2023.

53.    In January and February 2023, many of MNAA's employees wanted Individual Transfers of their HSA accounts and were calling and requesting Individual Transfers and asking when the transfer process would start.

54.    Ms. Gaitantzis repeatedly emailed Mr. Bedrock and Ms. Ike informing them of the many employee requests for Individual Transfers and asking for permission to provide an email to the employees with an explanation.

55.    Ms. Ike orally responded to Ms. Gaitantzis by stating that she was waiting for Mr. Bedrock's approval to respond to employees asking about the HSA transfer process.  Mr. Bedrock never responded.  His willful and intentional refusal to communicate with Ms. Ike and Ms. Gaitantzis exacerbated the matter.  Several employees in turn contacted WEX directly, handled the recommended Individual Transfer process on their own, and had their funds in their HealthEquity accounts within approximately one week in January and February 2023.

56.    Ms. Gaitantzis remained in continuous contact with WEX and Mercer in a good faith effort to secure the Bulk Transfer that Mr. Bedrock wanted completed.

57.     Mercer eventually convinced WEX to agree to a Bulk Transfer in or about late January 2023.  It took weeks for WEX to agree.  Mercer also warned that there was a greater chance for errors with a Bulk Transfer and that it would take weeks longer to complete.  WEX stated that the earliest it could start the Bulk Transfer process was mid-March 2023.

58.     In an onsite meeting that occurred on or about January 24, 2023, between Ms. Gaitantzis, Mr. Bedrock, Ms. Ike, Ms. Bollinger, and Mercer Consultant Adrienne Johnson, Mr. Bedrock made it clear that, from that point forward, Ms. Bollinger was only to work with Ms. Ike on the HSA transfer process and that she was not to work or communicate directly with Ms. Gaitantzis any longer, thereby making Ms. Ike responsible for the Bulk Transfer process.  The Mercer representatives, Ms. Bollinger and Ms. Johnson, commented on the inappropriateness of Mr. Bedrock's conduct and demands.

59.     In a further act of retaliation, in February 2023 Mr. Bedrock met with Ms. Gaitantzis and Ms. Ike and told Ms. Gaitantzis that she was not to request any more meetings from AVP of Communications Stacey Nickens or Manager of Communications Olivia Parven.  Ms. Gaitantzis had previously worked with Ms. Nickens and Ms. Parven on a project involving the creation of a Total Compensation view in a new benefits platform to which all employees would have access.  This had been one of Ms. Gaitantzis' approved work Goals for 2023.  Yet Mr. Bedrock halted her work on the project and stripped her of all related duties and responsibilities.  He further refused to provide any explanation for these additional retaliatory actions.

60.     In February and March 2023, Ms. Gaitantzis reported her concerns of sex discrimination and retaliation for opposing, reporting, and refusing to remain silent about the same to Ms. Ike multiple times.  She advised Ms. Ike that she had opposed being directed to hire

a male for the HR Administrative Assistant position in December 2022 when that male was not as qualified as female candidates for the position, and that she was being retaliated against for requesting a meeting with Mr. Bedrock to discuss her concerns of sex discrimination.

61.    Ms. Ike advised Ms. Gaitantzis that she would speak with Mr. Bedrock about her concerns of retaliation and get back to her, but never got back to her.

62.    Ms. Gaitantzis also reported her concerns of sex discrimination and retaliation for opposing the same to HR Manager Amanda Potts multiple times.  Ms. Potts was being called into Ms. Ike's office for private meetings throughout the months of January through April 2023. Ms. Potts reported to Ms. Gaitantzis but was no longer sharing important work-related information with her, also at the direction of Mr. Bedrock.

63.    Speaking to her supervisors, HR managers, a talent acquisition specialist, in-house counsel, and others about matters of public concern and sex discrimination and retaliation was not a part of Ms. Gaitantzis' regular or official job duties, and substantial portions of her speech activity were not given pursuant to a duty as a Director of Compensation, Benefits, and HR Systems but rather as a cooperative person and concerned citizen exposing what she believed to be wrongdoing in Defendants' hiring processes.

64.    Once Mr. Bedrock had approved a communication to the staff about the Bulk Transfer process, the Bulk Transfer began on March 13, 2023.  Once WEX started this process, it took several more weeks to get employees' HSA funds into their accounts.

65.    Throughout March and April 2023, the Mercer representative assigned to the Bulk Transfer process and Ms. Gaitantzis remained in continuous contact with WEX and HealthEquity.

66. On April 21, 2023, while on approved PTO, Ms. Gaitantzis drafted a communication to employees who would receive funds via Bulk Transfer, as Mr. Bedrock had requested. The communication informed these employees that the transfer was in the QA Phase with WEX, was expected to be completed soon, and that the HR Team would inform them immediately upon its completion. Mr. Bedrock approved this communication and it was sent to employees on the evening of April 21, 2023.

67. On April 24, 2023, WEX and HealthEquity informed Ms. Gaitantzis that the Bulk Transfer process had been completed. Ms. Gaitantzis was on approved PTO and traveling that day but informed Benefits Specialist Wanda McCroskey that afternoon that HealthEquity had sent an email stating that it had received the transfer and to advise the staff. Ms. McCroskey advised that she had been very busy that afternoon but would do so the next morning.

68. On April 25, 2023, in a 9:00 a.m. HR Team Meeting, Ms. Gaitantzis advised those in attendance that the transfer had been completed and that her team would send an email to employees letting them know.

69. Ms. McCroskey and Ms. Gaitantzis then prepared a short email notification to employees as a follow up to the communication previously approved by Mr. Bedrock and sent to them on April 21, 2023. The April 25, 2023, communication was consistent with the April 21, 2023, communication.

70. In accordance with their April 21, 2023, promise to notify employees when the HSA transfer process had been completed, Ms. McCroskey emailed the communication to employees on April 25, 2023, advising them that the process had been completed.

71. Shortly thereafter, Mr. Bedrock sent Ms. Gaitantzis an email asking her who had authorized the April 25, 2023, email communication to employees. Ms. Gaitantzis responded

that she had authorized the communication as her team had promised the employees that it would notify them immediately once the transfer was complete.

72.     At 2:00 p.m. on April 25, 2023, Ms. McCroskey and Ms. Gaitantzis attended a meeting with Mr. Bedrock and Ms. Ike in Mr. Bedrock's office.  In the meeting, Ms. McCroskey and Ms. Gaitantzis were reprimanded for sending the email notification to employees earlier that day even though it was entirely consistent with the communication to employees that Mr. Bedrock had approved on April 21, 2023.

73.     In the April 25, 2023, meeting Mr. Bedrock was again animated, angry, and yelling.  He and Ms. Ike then acted as if they did not know that the HSA transfer had not been completed on April 12, 2023, even though Ms. McCroskey and Ms. Gaitantzis had never stated that it had been completed on April 12, 2023, no communication had been sent to the staff to that effect, and each of their weekly HR Staff Reports in Microsoft Teams stated that they were still waiting for WEX to transfer the funds.

74.     At 3:15 p.m. on April 25, 2023, Ms. Ike sent Ms. Gaitantzis a text message stating, "Report to Neale [Bedrock]'s Office."

75.     Ms. Gaitantzis then met with Mr. Bedrock and Ms. Ike.  Mr. Bedrock then stated to Ms. Gaitantzis that she was being suspended for three days for alleged "insubordination."

76.     Ms. Gaitantzis returned to work as scheduled on May 1, 2023.  She met with Mr. Bedrock and Ms. Ike.   Mr. Bedrock stated to Ms. Gaitantzis that he was terminating her employment for "mismanagement of the HSA Bulk Transfer."  He stated that while she was suspended he learned that some employees' funds were not transferred and that she had mismanaged the process.  Ms. Gaitantzis stated that she was not aware of this issue and had not been afforded any opportunity to address it.

77.     Mr. Bedrock then smiled at Ms. Gaitantzis and stated that she would be paid through that day, May 1, 2023.  He then handed her a letter stating that she was terminated for unspecified alleged "performance issues" with "the latest example" being "mismanagement of the consolidation of the HSA accounts."

78.     Mr. Bedrock then had a police officer escort Ms. Gaitantzis to her desk to gather her belongings and then out of the building.

79.     As General Counsel and Chief Compliance Officer, Mr. Bedrock was one of Ms. Gaitantzis' supervisors who controlled the terms and conditions of her employment, had authority to suspend and discharge her, and made the decisions to suspend and discharge her.

80.     Mr. Bedrock had final policy making authority on behalf of MNAA and abused that authority under color of state law in suspending and discharging Ms. Gaitantzis.  Mr. Bedrock's conduct violated clearly established statutory and constitutional rights of which he and objectively reasonable persons in his position would have known, and such conduct was unreasonable in light of those clearly established rights.

81.     Ms. Gaitantzis' speaking or engaging in speech conduct as a citizen on matters of public concern and her speaking out about, opposing, and reporting sex discrimination and retaliation motivated and caused the adverse employment actions she suffered.

82.     Defendants' asserted reason for discharging Ms. Gaitantzis is false and pretextual. She did not make the decision to do Individual HSA Transfers; WEX and Mercer directed that they be done as Individual Transfers and her supervisor, Ms. LaRoche, had approved it and decided to do the transfers that way.  Furthermore, Ms. Ike had taken over responsibility for the Bulk Transfer process on January 24, 2023, at Mr. Bedrock's direction.

83.     Further, Ms. Gaitantzis did not receive any progressive discipline or performance improvement plans from Defendants before her abrupt discharge.  She was an excellent employee.  When she began working for MNAA, its Benefits processes were manual, not automated, outdated and dysfunctional, and exposed it to liability.  Ms. Gaitantzis implemented the "4MyBenefits" platform that integrated with its HR Information System.  This was a major performance accomplishment.  She received praise from Ms. LaRoche and MNAA's President & CEO, Mr. Kreulen, for the improvements she made.  Ms. Gaitantzis' December 29, 2022, performance review was also satisfactory or better overall and she met all of her performance goals and expectations.

84.     Defendants further treated Ms. Gaitantzis differently and less favorably in the terms, conditions, and privileges of employment than younger and male employees and employees who had not opposed, reported, and refused to remain silent about sex discrimination. Indeed, multiple younger and male employees and employees who had not opposed discrimination reporting to Mr. Bedrock engaged in similar and worse alleged conduct to that in which Defendants allege Ms. Gaitantzis engaged, but were not discharged.  For example, Ms. Ike, who is approximately 36 years old, was not discharged for her above-described role in and responsibility for the HSA transfer process that Defendants assert was "mismanaged."

85.     Additionally, two younger male employees who had not opposed discrimination used illegal substances during work hours, crashed a company van as a result, and illegally left the scene of the accident.  The driver further concealed and did not report the fact that the other employee was in the van with him.  Despite their illegal conduct, Defendants gave these younger male employees who had not opposed discrimination three-day suspensions, did not discharge them, and returned them to work under Mr. Bedrock.

86.     Further, Director of HR & Organizational Development Toiya Walker, who is significantly younger than Ms. Gaitantzis and who had not opposed discrimination, had exceedingly poor performance and repeatedly engaged in unacceptable behavior, including disrespectful and dishonest conduct, but was not discharged.  HR Managers Starks and Potts and Ms. Gaitantzis reported Ms. Walker's poor performance and misconduct to Ms. LaRoche many times in 2022.  Ms. LaRoche advised them that she was documenting all of these issues and problems and presenting them to Mr. Bedrock.  Ms. LaRoche later advised them that Mr. Bedrock refused to take any action with respect to Ms. Walker because she is African American and because MNAA has a federal race discrimination lawsuit pending against it in which a former African American employee, Edward McDonald, contends that MNAA discharged him because of his race, among other claims.

87.     As described above, Defendants retaliated against, suspended, and discharged Ms. Gaitantzis in violation of 42 U.S.C. § 1983 and the First Amendment to the United States Constitution for engaging in constitutionally protected speech activity as a citizen on matters of public concern—*i.e.*, speaking out about, opposing, and reporting sex discrimination and her being retaliated against for doing so.

88.     As described above, Defendants violated Ms. Gaitantzis' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution to be free from discrimination and retaliation based upon her sex and age and her opposition to sex discrimination.

89.     MNAA is further liable for the violations of Ms. Gaitantzis' federal constitutional rights because it failed to provide proper supervision and training to prevent the unlawful discriminatory and retaliatory conduct described in this complaint.

90.     As described above, MNAA also discriminated against Ms. Gaitantzis, subjected her to disparate treatment, refused to promote her to an AVP of HR position, suspended her, and discharged her because of her sex and/or age, in violation of Title VII, the ADEA, and the THRA.

91.     As described above, MNAA retaliated against, suspended, and discharged Ms. Gaitantzis for opposing, reporting, and refusing to remain silent about sex discrimination and retaliation to multiple supervisors, HR managers, a talent acquisition specialist, in-house legal counsel, and others and for requesting a meeting with Mr. Bedrock to discuss her concerns of sex discrimination, in violation of Title VII and the THRA.

92.     Defendants' conduct as described in this Complaint was malicious and/or recklessly indifferent to Ms. Gaitantzis' federally protected rights and willful.

93.     As a direct result of Defendants' discriminatory and retaliatory conduct, Ms. Gaitantzis has lost income and other privileges and benefits of employment; suffered embarrassment, humiliation, emotional distress and anxiety, inconvenience, and loss of enjoyment of life; and has incurred attorneys' fees, costs and litigation expenses.

## CLAIMS

94.     Ms. Gaitantzis incorporates all of the paragraphs above as if fully stated in each count below.

### Count I Against Defendants MNAA and Bedrock in his Official Capacity
### Violation of 42 U.S.C. § 1983: Retaliation in Violation of the
### First Amendment to the United States Constitution

95.     Defendants deprived Ms. Gaitantzis of her rights secured by the First Amendment to the United States Constitution while acting under color of state law.

96.     Ms. Gaitantzis engaged in constitutionally protected speech activity as a citizen on matters of public concern and her interest in such activity outweighs Defendants' interest in promoting the efficiency of the public service MNAA provides as an employer.

97.     Ms. Gaitantzis' speech activity did not disrupt the workplace and Defendants had no legitimate competing interest in prohibiting it for the Court to balance.

98.     Ms. Gaitantzis suffered adverse employment actions that would chill an ordinary person in the exercise of her constitutional rights.

99.     Ms. Gaitantzis' protected speech activity was a substantial or motivating factor in the adverse employment actions that she suffered.

100.    Defendants subjected Ms. Gaitantzis to adverse employment actions in violation of 42 U.S.C. § 1983 and the First Amendment to the United States Constitution.

101.    Defendants' conduct was malicious and/or recklessly indifferent to Ms. Gaitantzis' federally protected rights.

102.    Defendants' conduct harmed and caused damage to Ms. Gaitantzis.

**Count II against Defendants MNAA and Bedrock in his Official Capacity**
**Violation of 42 U.S.C. § 1983: Sex and Age Discrimination in Violation of the Equal**
**Protection Clause of the Fourteenth Amendment to the United States Constitution**

103.    Defendants deprived Ms. Gaitantzis of her rights secured by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution while acting under color of state law.

104.    Defendants violated Ms. Gaitantzis' Fourteenth Amendment right to be free from discrimination and retaliation as a result of her sex and age and her opposition to sex discrimination.

105. MNAA is further liable for the violations of Ms. Gaitantzis' federal constitutional rights pursuant to § 1983 in that it failed to provide proper supervision and training to prevent the unlawful discriminatory and retaliatory conduct described in this complaint.

106. Defendants subjected Ms. Gaitantzis to disparate treatment and adverse employment actions in violation of 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

107. Defendants' conduct was malicious and/or recklessly indifferent to Ms. Gaitantzis' federally protected rights.

108. Defendants' conduct harmed and caused damage to Ms. Gaitantzis.

## Count III Against Defendant MNAA
## Violation of Title VII

109. MNAA discriminated against Ms. Gaitantzis, subjected her to disparate treatment, refused to promote her to an AVP of HR position, suspended her, and discharged her because of her sex, in violation of Title VII.

110. MNAA retaliated against, suspended, and discharged Ms. Gaitantzis for opposing, reporting, and refusing to remain silent about sex discrimination and retaliation to multiple supervisors, HR managers, a talent acquisition specialist, in-house legal counsel, and others and for requesting a meeting with Mr. Bedrock to discuss her concerns of sex discrimination, in violation of Title VII.

111. MNAA's conduct as described in this Complaint was malicious and/or recklessly indifferent to Ms. Gaitantzis' federally protected rights.

112. MNAA's conduct harmed and caused damage to Ms. Gaitantzis.

## Count IV Against Defendant MNAA
## Violation of the ADEA

113. MNAA discriminated against Ms. Gaitantzis, subjected her to disparate treatment, refused to promote her to an AVP of HR position, suspended her, and discharged her because of her age, in violation of the ADEA.

114. MNAA's conduct as described in this Complaint was willful.

115. MNAA's conduct harmed and caused damage to Ms. Gaitantzis.

**Count V Against Defendant MNAA**
**Violation of the THRA**

116. MNAA discriminated against Ms. Gaitantzis, subjected her to disparate treatment, refused to promote her to an AVP of HR position, suspended her, and discharged her because of her sex and/or age, in violation of the THRA.

117. MNAA retaliated against, suspended, and discharged Ms. Gaitantzis for opposing, reporting, and refusing to remain silent about sex discrimination and retaliation to multiple supervisors, HR managers, a talent acquisition specialist, in-house legal counsel, and others and for requesting a meeting with Mr. Bedrock to discuss her concerns of sex discrimination, in violation of the THRA.

118. MNAA's conduct harmed and caused damage to Ms. Gaitantzis.

**RELIEF REQUESTED**

WHEREFORE, Ms. Gaitantzis respectfully requests:

1. A jury trial;

2. Back pay and damages for lost benefits;

3. Compensatory damages for embarrassment, humiliation, emotional distress and anxiety, inconvenience, and loss of enjoyment of life;

4. Reinstatement or, alternatively, front pay and damages for lost benefits;

5. Punitive damages under § 1983 and Title VII;

6.      Liquidated damages under the ADEA;

7.      Attorneys' fees, costs and litigation expenses;

8.      Prejudgment interest and, if applicable, post judgment interest; and

9.      Such other and further legal or equitable relief to which she may be entitled.


                        Respectfully submitted,



                        s/Douglas B. Janney III
                        Douglas B. Janney III (TN BPR No. 19112)
                        Law Office of Douglas B. Janney III
                        5115 Maryland Way
                        Brentwood, Tennessee 37027
                        (615) 742-5900
                        doug@janneylaw.com

                        Attorney for Plaintiff